IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                       Criminal No. 1:14-cr-29

PETRUS HAWKINS,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This matter is before the undersigned for consideration of Defendant Petrus Hawkins' "Motion to Suppress Gun Evidence," filed on May 7, 2014. (Docket No. 8.) This matter was referred to the undersigned by United States District Judge Irene M. Keeley on May 8, 2014. (Docket No. 9.) On May 21, 2014, came Defendant, in person and by counsel, Thomas Dyer, and the United States by its Assistant United States Attorney, Zelda Wesley, for hearing on Defendant's motion.

### I. PROCEDURAL HISTORY

On April 1, 2014, Defendant was indicted by a Grand Jury sitting in the Northern District of West Virginia and was charged with being a felon in possession of a firearm. (Docket No. 1.) He was arraigned before the undersigned on April 21, 2014 and entered a plea of "Not Guilty." Trial is scheduled to begin with jury selection on June 24, 2014.

### II. CONTENTIONS OF THE PARTIES

Defendant contains that the firearm seized from the vehicle in which Defendant was a passenger on June 27, 2013 must be suppressed because:

1.     There was no reason for the officer to stop the vehicle because both Defendant and the driver, Tiffany Cooper, deny that they were traveling at

> an excessive rate of speed;

2. There was no reasonable suspicion that criminal activity was afoot; and

3. Neither Defendant nor Ms. Cooper gave consent to a search of the vehicle.

(Docket No. 8-1 at 4-5.)

The Government contends that the "officers' actions were lawful and constitutional" and therefore Defendant's motion should be denied. (Docket No. 12 at 1.) Specifically, the Government states that the "officers' reports clearly demonstrate that both their initial stop of the vehicle in which the defendant was a front seat passenger, and their subsequent actions (in having a drug dog 'sniff' the vehicle, in their searching it following the dog's 'alert' and their seizing of the stolen firearm found therein) were constitutional and soundly within the bounds of the Fourth Amendment." (Id. at 5.)

### III. STATEMENT OF THE FACTS

The undersigned heard the testimony of Officers Garrett Melan and Aaron Dull, both of the Morgantown, West Virginia Police Department. The undersigned also heard the testimony of Special Agent Ella Snyder from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Defendant presented the testimony of Ms. Tiffany Cooper. From such testimony, the undersigned finds the following facts:

1) Garrett Melan (Melan), a police officer employed by the City of Morgantown, was working the midnight shift (11p.m. to 7a.m.) on June 27, 2013.

2) At approximately 12:35 a.m.[1], with his cruiser parked in the driveway of the Southern States

---

[1] Time derived from Melan's police report as quoted from in Defendant's Memorandum Of Law In Support Of His Motion To Suppress Gun Evidence (DE 8-1, p.1).

in Sabraton, West Virginia, Melan observed a yellow Dodge vehicle driving on Route 7 at what he considered to be an excessive rate of speed.

3) Melan pulled out and followed the Dodge for approximately 3/10 of a mile "pacing" the same as it proceeded out Route 7 toward the I-68 entrance ramps.

4) "Pacing" is a technique used by Melan to determine the approximate speed of another vehicle. It involves traveling behind the other vehicle at a uniform distance for some period long enough to determine from the speedometer on the pacing vehicle the approximate speed of the vehicle being followed.

5) Melan determined the Dodge was traveling 18 miles over the posted 35 mph limit for Route 7 inside Sabraton.

6) Melan continued to follow the Dodge as it turned off Route 7 on to the east bound entrance ramp of I-68 and traveled east on I-68.

7) While following the Dodge, Melan called in the West Virginia license plate number on the Dodge to check its registration and was advised by radio that the Dodge was owned by a Pennsylvania resident.

8) As the Dodge approached the Pierpont exit off I-68 Melan began a traffic stop. The Dodge pulled over on the Pierpont exit ramp.

9) Melan called in the stop to the com center.

10) Melan approached the driver's side door and asked the driver, Tiffany Cooper (Cooper), if she knew she was speeding. He also asked for the vehicle registration. Melan does not recall whether he asked for her driver's license but does recall asking her for identifying information such as name and date of birth.

11) Cooper responded to Melan's question concerning speeding by stating that she was upset because her brother had taken her car and not returned it. Melan became concerned that Cooper may be the victim of a domestic situation or was a hostage at the hand of Defendant, the passenger in the car, by reason of Cooper's rapid rate of speech, rapid movement of her hands while talking, puffy eyes, and irrelevant response to Melan's question relative to speeding.

12) Melan's concern was exacerbated by his observations that Defendant did not make eye contact and instead looked either out the passenger side window or straight ahead during Melan's conversation with Cooper and initially did not "chime in"[2] during the conversation. Defendant did give a rational explanation about the ownership of the vehicle to Melan before Melan went to his cruiser to check the registration and identity information.

13) At some point during the traffic stop, Melan took the registration and identity information back to his cruiser to have it run.

14) At approximately 12:55 a.m.[3] Morgantown police officer Aaron Dull (Dull) arrived on the scene of the traffic stop. Dull, while on patrol on High Street in Morgantown, heard the radio traffic concerning Melan's stopping the Dodge vehicle. Pursuant to police department protocol, Dull drove directly to the scene to offer support.

15) While Dull was en route, Melan called for back up from his cruiser as part of the process of checking the identification information of the driver and the registration information of the

---

[2]Cooper told Melan the Dodge was Defendant's "baby's mother's vehicle." Melan expected Defendant would have some comment but he made none and continued to look straight ahead.

[3]Time derived from Dull's Call Summary Report testified from by Dull at the hearing.

4

vehicle.

16) On arrival, Melan briefed Dull about his concerns for Cooper's welfare.

17) With Melan's acquiescence, Dull, being the more experienced of the two police officers, took over. Melan went to the Dodge and asked Cooper to exit and come with him[4]. Cooper testified she was reluctant to leave the car but that the officer was insistent that she do so.

18) Cooper exited the Dodge and joined Dull near the rear of the Dodge.

19) Melan stationed himself between where Dull and Cooper were standing and the car for security purposes.

20) Another officer, Murphy, may have arrived at the scene by this point and was at the passenger side door where Defendant was situated.

21) When Cooper met with Dull, Dull recognized Cooper as a person he had seen with others in downtown Morgantown. Dull associated that group with the use and distribution of illegal drugs. In particular, Dull associated Cooper's husband and brother, but not Cooper, with drugs. In addition, he remembered conducting a traffic stop of Cooper during which a large amount of currency was located.

22) Instead of asking Cooper questions concerning her welfare, Dull asked his standard set of drug related traffic stop questions. He started with a general question whether there were any illegal drugs in the car. Then he followed with a series of questions about specific types of drugs. For everything but marijuana he got a definite "no." With respect to whether there was marijuana in the car Cooper stated: "There shouldn't be." Cooper admitted to Dull that

---

[4]Dull testified Cooper was not out of the car with Melan when he arrived on the scene.

she had smoked marijuana earlier in the day and that she had not changed her clothes since. She told Dull she and Defendant were headed to a nearby motel. Dull knew from his prior contacts with Cooper that she lived in a house on Ashland Street in Morgantown.

23) Dull asked Melan to take Cooper and instructed Murphy to bring Defendant from the car to talk with Dull.

24) Dull asked Defendant the same general and specific questions about drugs that he had asked Cooper. Defendant responded "No" to all questions. Defendant told Dull he and Cooper were headed to the motel to visit friends and he had a the motel room key. Defendant told Dull the car was "my baby's mamma's car."

25) Based on the above, and without more, Dull decided to have his canine unit, Arco, perform a "free air drug sniff."

26) Dull described the "free air sniff" process as: a) get the dog out; b) place the dog with the wind blowing in the dog's face from the area (car) of interest; and c) release tension on the dog's leash and let the dog progress to the point where the scent of any drugs is the strongest.

27) As the dog approaches the point where the scent of drugs is the strongest he may give general alerts such as a stiff tail or head snap. That is followed by a "hard sniff," going to the point of the strongest scent, and sitting down.

28) Arco is a "passive alert" trained and certified drug dog.

29) Defendant and Cooper were standing between Arco and the Dodge car.

30) Arco did not alert with respect to either Cooper or Defendant.

31) Arco did alert to the driver's side door of the Dodge.

32) After alerting, Dull returned Arco to his police cruiser.

33) Dull then conducted a warrantless and unconsented to search of the Dodge. He located Cooper's purse, which contained cigarette type rolling papers and a small amount of marijuana "shake" in it. He also located a loaded .45 caliber pistol in the glove box or compartment on the passenger side of the vehicle.

34) Dull directed Cooper and Defendant be detained because neither of them had told him there was a gun in the car.

35) Dull questioned Cooper about the gun. Cooper denied knowing the gun was in the car and denied ownership of the gun.

36) The pistol was run through NCIC and determined to be stolen.

37) Defendant was run through NCIC and determined to be a convicted felon.

38) Since Defendant had said the car was his "baby mamma's" and was in the car as a passenger where the glove box containing the gun was located, he was taken in to custody and charged with being a felon in possession of a firearm.

38) Nothing was seized from Cooper's purse or person; she was not charged or cited[5] for any offense; and she drove away from the scene in the Dodge.

## IV. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by police, even if only

---

[5] Melan testified he thought he gave Cooper a warning ticket for speeding. Cooper denies receipt of such a warning. No copy of such a warning was provided to the Court.

7

for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979). This is true "no matter how brief the detention or how limited its purpose." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren, 517 U.S. at 810. The issue is two-fold: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968).

To justify stopping a vehicle, an officer must have reasonable suspicion that illegal activity has occurred or is occurring. See id. at 21. This analysis "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). As the Supreme Court has explained, reasonable suspicion is "more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (quoting Terry, 392 U.S. at 27). A traffic stop is valid if it is legally justified at its inception, regardless of the motive behind the stop. United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993).

Officer Melan had reasonable suspicion to stop the Dodge vehicle driven by Cooper during the early morning hours of June 27, 2014. Based on Melan's experience, when he first observed the Dodge on Route 7 in Sabraton, he suspected it was traveling faster than the 35 mph posted limit. That suspicion, however, was not the sole basis for his later decision to pull the Dodge over as it approached the Pierpont Exit off I-68. Melan followed the Dodge for 3/10 of a mile on Route 7 using a "pacing" technique. Using that technique, he determined the Dodge was being driven

8

approximately 18 miles faster than the posted speed limit. Any argument by Cooper that she was not speeding is belied by her own grand jury testimony[6] that she herself estimated she was driving 40 mph and over the posted speed limit while traveling on Route 7 in Sabraton. Accordingly, Melan's initial stop of the Dodge was justified based on Melan having probable cause to believe the driver was speeding. Hassan El, 5 F.3d at 730; see also Whren, 517 U.S. at 810.

The inquiry next proceeds to whether the detention of Cooper and Defendant at the side of the exit ramp was too long in duration to be justified as an investigative stop incident to a suspected speeding violation. For this inquiry, "it is appropriate to examine whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 675 (1985). Accordingly, the Court must ask: Was the action of Melan reasonably related in scope to the circumstances which justified the interference in the first place? See id. at 682 (internal citation omitted). There is no "bright line" rule for evaluating whether an investigative detention is unreasonable. "[C]ommon sense and ordinary human experience must govern over rigid criteria." Id. at 685. Moreover, the Supreme Court has admonished courts assessing whether a detention was too long in duration to be justified as an investigative stop to "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." Id. at 686. Melan approached the Dodge and requested that the driver, Cooper, produce the vehicle registration and asked her for identification information including information relative to the right to be operating the car. "The officer may request a driver's license and vehicle registration, run a computer check, and issue a citation" within the scope

---

[6]Presented during cross-examination of Cooper.

9

of a routine traffic stop. Branch, 537 F.3d at 335; Rusher, 966 F.2d at 876.

While Melan was engaged in the discussion with Cooper at the driver's side of the Dodge, Melan observed Cooper's nervous demeanor, her puffy eyes, her rapid speech and hand motions, and her seemingly irrelevant comment about her brother having taken and not returning her car. These actions by Cooper coupled with Defendant's failure to make eye contact and engage with the officer suggested to him there may be a domestic situation or something worse going on between Cooper and Defendant. It cannot be said that these actions by either Cooper or Defendant obstructed Melan in his efforts in any way. However, additional inquiry for Cooper's protection was justified and reasonable. See Branch, 537 F.3d at 336. In order to extend the traffic stop beyond the time it takes to issue the ticket, the officer must either have the driver's consent or a "reasonable suspicion that criminal activity is afoot. Id. These were Melan's thoughts and concerns as he took the information back to his cruiser to run the computer check incident to writing a speeding ticket or warning ticket. While in the cruiser, Melan called for back-up which, unknown to him, was already en route.

Based on the best evidence available to the court from the testimonies at the hearing, the time spent by Melan between the time the Dodge was stopped and when he returned to the Dodge after running the computer check was at the least 4 minutes and at the most 20 minutes (12:35 a.m. to 12:55 a.m.) A 20-minute detention of a suspect has been found to meet Fourth Amendment's standard of reasonableness. Sharpe, 478 U.S. at 683; see also Branch, 537 F.3d at 336 (finding that a 30-minute delay for a drug dog to be brought to the traffic stop was not unreasonable and holding that "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than

10

was necessary").

The Fourth Circuit in Branch instructed: "If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." Branch, 537 F.3d at 336. However, "a precise articulation of what constitutes 'reasonable suspicion' is 'not possible.'" Id. The court further outlined the several principles that "should animate any judicial evaluation of an investigatory detention pursuant to Terry." Id. Those principles are:

1) "[T]he quantum of proof necessary to demonstrate 'reasonable suspicion' is 'considerably less than [a] preponderance of the evidence." Id. (citation omitted).

2) "[A] court must take a commonsense and contextual approach to evaluating the legality of a Terry stop. . . . To that end, the Supreme Court has noted that 'reasonable suspicion' is a 'nontechnical conception [] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" . . . Thus, context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances. And respect for the training and expertise of police officers matters as well: it is entirely appropriate for courts to credit 'the practical experience of officers who observe on a daily basis what transpires on the street." . . . In sum, *post hoc* judicial review of police action should not serve as a platform for 'unrealistic second guessing' of law enforcement judgment calls. Id. at 337 (internal citations omitted).

3) "[A] court's review of the facts and inferences produced by a police officer to support a Terry stop must be holistic. Courts must look at the 'cumulative information available' to the officer, . . . and not find a stop unjustified based merely on a 'piecemeal refutation of each individual' fact and inference . . . . A set of factors, each of which was individually 'quite consistent with innocent travel,' could still, 'taken together,' produce a 'reasonable suspicion of criminal activity.'" Id. (internal citations omitted).

4) "[A] police officer's decision to stop and detain an individual must be evaluated objectively. . . . Thus, the lawfulness of a Terry stop turns 'not on the officer's actual state of mind at the time the challenged action was taken,' . . . but rather on 'an objective assessment of the officer's actions . . . .' In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent." Id. (Internal citations omitted).

11

As Melan started to return to the Dodge after running the identification and registration checks, Officer Dull arrived on the scene as backup. Melan expressed his concerns for Cooper's safety to Dull. Dull, as the senior officer, instructed Melan to have Cooper exit the Dodge to talk with Dull privately. It is clear from the evidence that Cooper resisted getting out of the car to talk and insisted she was ok. Cooper explained in her testimony that at age 14 she had been raped by a police officer. She ultimately exited the vehicle. From the evidence, the Court cannot conclude that Cooper exited voluntarily and thereby extended the traffic stop. Id.

When Cooper did exit the vehicle, Dull immediately recognized her as someone he had related to being with others known by him to be involved in illicit drugs. Dull questioned Cooper while standing near the rear of the Dodge. It was during this question and answer session that Cooper told Dull she had smoked marijuana earlier and gave a less than emphatic no response to the question whether there was any marijuana in the Dodge.

Applying the principles of Branch and looking at the totality of the circumstances that Melan confronted and related to Dull and that were observed by Dull himself, Dull now had "reasonable suspicion" that illegal activity was afoot. By reason of the totality of the circumstances including: the disclosure by Cooper that she had smoked marijuana earlier, Dull's knowledge of Cooper's association with those engaged in illicit drug usage, Cooper's less than emphatic no to the question of whether marijuana was inside the Dodge, her nervous demeanor as described to Dull by Melan on his arrival, and that it was after midnight, Dull had reasonable suspicion drugs may be in the Dodge and a reasonable basis to bring on his drug sniffing dog, Arco. See United States v. Foreman, 369 F.3d 776, 784-785 (4th Cir. 2004) (upholding a drug dog sniff and ultimate search of a vehicle stopped and detained for a traffic violation based upon the defendant's refusal to consent

to a search of his vehicle at the conclusion of the traffic stop, the defendant telling the officer he had driven seven hours to New York City, a known source city for illegal narcotics, stayed but a few hours and returned to West Virginia, defendant has several air fresheners in the car which the officer noted were commonly used to mask the smell of narcotics, defendant was exceptionally nervous and became even more so when the officer raised the issue of drug trafficking.*)*

In <u>United States v. Mason</u>, 628 F.3d 123 (4th Cir. 2010), a police officer conducted a drug detection dog inspection of an automobile he had stopped and cited for having tinted windows. The court determined the officer"s observations that the defendant was "nervous and sweating", of an "extreme odor of air freshener coming from the vehicle, only one key on the key ring in the ignition, no luggage in the interior of the vehicle, a newspaper from that day with a Radisson Hotel sticker on it, were sufficient to justify the officer's suspicions that the defendant and his passenger were on "a turn-around" trip to Atlanta, a known source city for drugs, using interstate 20, a common route for drug traffickers and the officer's additional questions. The contradictory answers to the officer's questions by the driver and one of the occupants of the car, coupled with the noted observations led the officer to conclude that both the driver and occupant were lying about their itinerary and were involved in criminal activity. A sweep of the car by a K-9 resulted in the dog alerting at both the passenger-side door and the driver's side door. The resulting search by the officers located approximately 10 kilograms of cocaine powder in a black gym bag in the trunk of the car. After citing a host of cases, the court upheld the officer's extension of the traffic stop by asking drug related questions holding: "[A]n officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention" and "[I]n sum, the questions posed by Trooper Swicord during the

13

traffic stop that were unrelated to the basis for the stop did nothing to diminish the stop's constitutionality, given that they caused only a brief delay." Id. at 132-133. The court went so far as to note: "[t]here is no support in Fourth Amendment jurisprudence for the notion that questioning unrelated to the purpose of a traffic stop requires reasonable suspicion, provided that the questioning occurs within the time frame reasonable necessary to effectuate the traffic stop." Id. at 131.

In sum, the undersigned finds that Officer Dull extended the traffic stop initiated by Melan beyond when Melan would have given the citation to Cooper. The undersigned finds the extension to have only been a brief delay of less than 20 minutes. The undersigned finds the extension and the asking questions of Cooper and of Defendant concerning the presence of drug in the car was justified under the totality of the circumstances. Based on the observations of Cooper's demeanor, Melan was reasonably concerned for her welfare and justified in telling Dull what he saw. Dull was then reasonably justified in having Melan get Cooper out of the car so he could talk with her away from any influence by Defendant. Once Cooper was out of the car and recognized by Dull, the focus of Dull's inquiry of Cooper was undoubtedly influenced by his prior knowledge of her. That inquiry coupled with what he knew and what he had been told by Melan concerning Cooper's demeanor reasonably heightened Dull's suspicions. The undersigned finds that Dull's decision to retrieve his canine partner, Arco, from his cruiser and to have Arco conduct a free air sniff in the vicinity of the car was reasonable based on the totality of the circumstances presented to Dull and Melan. Once the dog alerted, no consent to search was required and the search resulting in the discovery of the firearm in question was constitutionally justified.

## V. RECOMMENDATION

For the reasons stated herein, it is **RECOMMENDED** that Defendant's "Motion to Suppress

14

Gun Evidence" (Docket No. 8) be **DENIED**.

Any party may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 30th day of May, 2014.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE